

1  **KROGH & DECKER, LLP**
   DEREK C. DECKER (SBN 232243)
2  CRYSTAL HUYNH-KIM (SBN 334452)
   555 Capitol Mall, Suite 700
3  Sacramento, CA 95814
   916.498.9000 (p)
4  916.498.9005 (f)
   derekdecker@kroghdecker.com
5  crystalhuynhkim@kroghdecker.com

6  Attorneys for Plaintiff
   CRAIG CHAQUICO
7

8                    UNITED STATES DISTRICT COURT

9                    NORTHERN DISTRICT OF CALIFORNIA

10

11 CRAIG CHAQUICO, an individual,        ) CASE NO: _____
                                         )
12         Plaintiff,                    ) **COMPLAINT FOR:**
                                         )
13 vs.                                   ) 1. ACCOUNTING
                                         )
14 JEFFERSON STARSHIP INC., a California ) DEMAND FOR JURY TRIAL
   corporation; STARSHIP, INC., a California )
15 corporation; SHIPRATS INC., a California )
   corporation; JEFFERSON AIRPLANE INC., a )
16 California corporation; AFTERTHOUGHT )
   PRODUCTIONS CORP., a California )
17 corporation; SONY MUSIC )
   ENTERTAINMENT DIGITAL, LLC, a )
18 California limited liability company; )
   WARNER MUSIC GROUP CORP. dba )
19 RHINO ENTERTAINMENT, a Delaware )
   corporation; WARNER MUSIC GROUP )
20 CORP. dba WARNER-TAMERLANE )
   PUBLISHING CORPORATION, a Delaware )
21 corporation; WIXEN MUSIC PUBLISHING, )
   INC., a California corporation; STEPHANI )
22 THOMPSON, as executor of ESTATE OF )
   WILLIAM CARL THOMPSON; TYRONE )
23 THOMPSON, as representative of ESTATE )
   OF WILLIAM CARL THOMPSON; BILL )
24 GRAHAM ARCHIVES, LLC dba )
   WOLFGANG'S VAULT, a Delaware limited )
25 liability company; JEFF JAMPOL, an )
   individual; JAMPOL ARTIST )
26 MANAGEMENT, a California corporation; )
   ALEXANDER KANTNER, as successor-in- )
27 interest to ESTATE OF PAUL LORIN )
   KANTNER; MICKEY THOMAS, an )
28 individual; DAVID FREIBERG, an individual; )
   CATHERINE RICHARDSON, an individual; )
                                            )

DONNY BALDWIN, an individual; and DOES )
1-50, inclusive, )
 )
        Defendants. )
 )
 )

Plaintiff Craig Chaquico, alleges as follows:

## **THE PARTIES**

1. Plaintiff Craig Chaquico (hereinafter referred to as "Chaquico" or "Plaintiff") is an individual and resident of Jackson County, Oregon.

2. Plaintiff is informed, believes, and alleges that Defendant Starship Inc. ("Starship") is a successor-in-interest entity of Jefferson Starship Inc., a California corporation with a principal place of business in San Rafael, California.

3. Plaintiff is informed, believes, and alleges that Defendant Jefferson Starship Inc. ("JSI") is a California corporation with a principal place of business in San Rafael, California.

4. Plaintiff is informed, believes, and alleges that Defendant Shiprats Inc. ("Shiprats") is a California corporation with a principal place of business in Mill Valley, California.

5. Plaintiff is informed, believes, and alleges that Defendant Afterthought Productions Corp. ("Afterthought") is a California corporation with a principal place of business in San Diego, California.

6. Plaintiff is informed, believes, and alleges that Defendant Sony Music Entertainment Digital LLC ("Sony") is a limited liability company formed in Delaware with a principal address in New York, New York but is registered to do business in California.

7. Plaintiff is informed, believes, and alleges that Defendant Jefferson Airplane Inc. ("JAI") is a Delaware corporation with a principal place of business in San Diego, California.

8. Plaintiff is informed, believes, and alleges that Defendant Stephani Thompson ("Stephani") is the executor of the Estate of William Thompson (who is deceased) and resides in Mill Valley, California.



9. Plaintiff is informed, believes, and alleges that Defendant Tyrone Thompson ("Tyrone") is one of the representatives of the Estate of William Thompson (who is deceased) and resides in Napa, California.

10. Plaintiff is informed, believes, and alleges that Defendant Rhino Entertainment ("Rhino") is a subsidiary of the Warner Music Group Corp. ("Warner") in which is a Delaware corporation with a principal address in New York, New York.

11. Plaintiff is informed, believes, and alleges that Defendant Warner-Tamerlane Publishing Corporation ("Warner-Tamerlane") aka Warner Chappell Music, Inc. ("Warner Chappell") is a subsidiary of the Warner in which is a Delaware corporation with a principal address in New York, New York.

12. Plaintiff is informed, believes, and alleges that Defendant Wixen Music Publishing, Inc. ("Wixen") is a California corporation with a principal address in Calabasas, California.

13. Plaintiff is informed, believes, and alleges that Defendant Bill Graham Archives, LLC dba Wolfgang's Vault ("Wolfgang"), a Delaware limited liability company.

14. Plaintiff is informed, believes, and alleges that Defendant Jeff Jampol ("Jampol") is an individual residing in Los Angeles, California, and CEO of Jampol Artist Management.

15. Plaintiff is informed, believes, and alleges that Defendant Jampol Artist Management ("JAM") is a California corporation with a principal place of business in West Hollywood, California.

16. Plaintiff is informed, believes, and alleges that Defendant Alexander Kantner ("Alex") as an heir and successor-in-interest of the estate of Paul Lorin Kantner's estate (who is deceased) and residing in Oakland, California.

17. Plaintiff is informed, believes, and alleges that Defendant Mickey Thomas ("Thomas") is an individual residing in Palm Desert, California.

18. Plaintiff is informed, believes, and alleges that Defendant David Freiberg ("Freiberg") is an individual residing in Novato, California.

19. Plaintiff is informed, believes, and alleges that Defendant Catherine Richardson ("Richardson") is an individual residing in Elmhurst, Illinois.

20. Plaintiff is informed, believes, and alleges that Defendant Donny Baldwin ("Baldwin") is an individual residing in Murphys, California.

21. Plaintiff is unaware of the true names or capacities, whether associate, corporate, individual, or otherwise, of DOE Defendants 1-50, inclusive, and therefore sues these Defendants by these fictitious names. Plaintiff will amend this Complaint to allege their true names and capacities when ascertained. Plaintiff is informed, believes, and alleges that each of the fictitiously named Defendants is responsible in some manner for the occurrences alleged here, and that these DOE Defendants proximately caused Plaintiff's injuries. Defendant and DOES 1-50, inclusive, may be referred to collectively as the "Defendants." This Complaint may refer to Plaintiff and the Defendants collectively as the "Parties."

22. Plaintiff is informed, believes, and alleges that at all relevant times, each of the Defendants conspired with the others to commit the tortious acts alleged here, and encouraged and aided the other Defendants in committing such acts.

23. Plaintiff is informed, believes, and alleges that the Defendants are, and at all relevant times mentioned were the employers, agents, partners, joint venturers, and/or alter-egos of the other Defendants.

24. The allegations of this complaint stated on information and belief are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery.

**JURISDICTION AND VENUE**

25. This Court has personal jurisdiction over the Defendants because, on information and belief, Defendants regularly transacts and conducts business within the State of California and within this District; Defendants regularly and systematically directs electronic activity into the State of California with the intent of engaging in business in this District; Defendants owns, uses, and/or possesses real and/or personal property

situated in the State of California and within this District; and/or Defendants has otherwise made or established contacts within the State of California sufficient to permit the exercise of personal jurisdiction.

26. The Northern District of California is proper venue in this matter under 28 U.S.C. §1391(c) because one or more defendants resides in this judicial district.

## **GENERAL ALLEGATIONS**

27. Plaintiff Craig Chaquico is a renowned musician best known as the lead guitarist and driving force behind the legendary rock bands Jefferson Starship and Starship. Chaquico was the only member of those bands to appear on every recording, album, tour, and music video over the course of the bands' tenure. Chaquico was the only band member to never miss a song, album, video, tour, or any event during his duration with both bands. As such, Chaquico has become intimately associated with all of the original hit songs and multi-platinum, best-selling albums of both Jefferson Starship and Starship, and the music of these bands has become intimately associated with Chaquico.

28. As an equal member of the bands from 1976 until Chaquico chose to separate from Starship in 1991, Chaquico diligently signed all band agreements with record companies and the corporation, sat in on all business meetings, paid his fair share of royalties towards band and corporate expenses, rehearsed, wrote and/or co-wrote hit songs and all signature guitar licks and riffs (and often other instrumental parts, melodies and lyrics) for both bands, contributing to multiple gold, platinum and double-platinum albums and dozens of hit singles. Chaquico often served as a band co-producer and background singer, and never missed a song, album, video, tour, or promotional opportunity for his duration with both bands.

29. Chaquico's work, music and image have been critical in the ongoing success of the trademarks for Jefferson Starship and Starship, now considered as a classic American band, which continue to generate income for the entities and individuals involved. In 1991, as the last original member of Jefferson Starship, Chaquico terminated his relationship with the band JSI, Starship, and Shiprats in return for his continuing equal

pro-rata shares of artist royalties, merchandising royalties, and any other income, royalties or advances payable with respect to any recording project, album, single or any other income, royalties or advances payable with respect to any recording project, album, single or any other material or project in which he participated.

30. Chaquico's agreement was with the stipulation that he would receive direct payment of all such royalties, both domestic and foreign, and advances and publishing royalties without being subject to any fees, commissions, or any other charges. Further, a completed letter of direction was to be sent to the applicable record companies, as well, stating the same along with a guarantee that any monies received by any corporate entity or individual and due to Chaquico would be remitted no later than 30 days after receipt. In addition, the annual ability to audit records and accountings was contractually guaranteed to Chaquico without a statute of limitations.

31. The dispute arises out of the Defendants refusal and lack of payment and production of royalties, revenue, right and accounting to which Plaintiff is entitled to.

32. On August 19, 1991, Plaintiff executed a Termination Agreement ("1991 Termination Agreement") for the purpose of determining payments for share of artist royalties, merchandising royalties and any other income, royalties, or advances with respect to any recording project, album, single, or any other material or project participated and more. Pursuant to section 6 of the 1991 Termination Agreement, Chaquico is entitled to an audit of the books and records that relate to Chaquico concerning Starship Inc., Shiprats, Inc., Bill Thompson Music and otherwise.

33. Between the years of 1992 through the present, Thomas, and 2016 through the present for Freiberg, Richardson, and Baldwin, these Defendants have been a receiver of merchandising income for Starship and Jefferson Starship by performing in numerous concerts, shows, tours, appearances and selling merchandise including, but not limited to, original music, videos, DVDs, CDs, t-shirts, guitar picks, etc. with the Jefferson Starship and Starship name. As for Thomas, as he is the Director of Shiprats, he should have information and knowledge of the accounting to which Chaquico is entitled to

pursuant to the 1991 Termination Agreement. As for Freiberg, Richardson, and Baldwin, they should also have information and knowledge of the accounting to the revenue, income, and royalties to which Chaquico is entitled to.

34. After William "Bill" Thompson passed away in January 2015, the JSI ran as various band entitles were left unmanaged and untamed for over a year. During that time, accountings on the bands were continuing essentially on autopilot as they had for years prior. In January 2016, Paul Kantner ("Kantner") passed away, resulting in an unrelated third party seeking to take over the Jefferson Starship band name, the trademark registration renewal of which had essentially lapsed in the preceding years.

35. Thomas had been touring for decades as with a post-1991 solo band "Starship Featuring Mickey Thomas" while selling re-recordings and merchandise under the classic band name "Starship" and commingling his solo band's name and history with that of Starship without evidence of a formal agreement to do so and without remittance to Chaquico of his royalties and fees pursuant to the 1991 Termination Agreement. Shortly after Kantner passed away and the problems with the Jefferson Starship trademark, Grace Slick ("Slick") alleged to be the last living shareholder of JSI. To this date, Slick has not provided legal documentation that she was an actual "shareholder" of JSI. However, she continued to act as the purposed shareholder of JSI and asked her personal accountant Timothy Jorstad ("Jorstad") to look into the band entities and operations and sought out Jeff Jampol, who was experienced in managing legacy artists such as The Doors, Janis Joplin estate, Ramones, etc. On the contrary, Chaquico had already spoke with Jeff Jampol in 2016 who had been purportedly hired by Kantner to represent his legacy interests as they related to Jefferson Airplane.

36. Between 2016 through the present, Jampol, as the CEO of JAM, is the legacy manager of JSI, Starship and Jefferson Airplane. Through those years, he has been negotiating licensing deals for their music catalogues, film, tv, commercial placements, books, theatrical, museum exhibits, documentaries, etc. for JSI and Starship. As such, Jampol has information and knowledge of the royalties, income, and revenue that is owed

7
COMPLAINT FOR ACCOUNTING

1  to Chaquico in connection with the 1991 Termination Agreement.

2      37.    Between 1991, Wolfgang has been selling extensive "Jefferson Starship" and "Starship" merchandise without revenue remittance entitled to Plaintiff in connection with Plaintiff's 1991 Termination Agreement. Through these deals, Wolfgang has information and knowledge of the royalties, income and revenue that is owed to Plaintiff. All of merchandise of which are being sold can be seen on Wolfgang's website at www.wolfgangs.com and by searching "Jefferson Starship," "Starship," and "Craig Chaquico."

    38.    Since at least December 2016, Wixen is the music publishing administrator for JSI, Starship and Jefferson Airplane. On December 30, 2016, an email by Jorstad to Chaquico stated that "the publishing administration for all entities has moved back to Wixen Publishing." As such, Wixen has information and knowledge of Plaintiff's unpaid neighboring rights royalties or otherwise known as "foreign royalties."

    39.    Since April 1, 1991, Warner-Tamerlane dba Warner Chappell has been licensing songs Chaquico wrote or co-wrote based on a 50/50 percentage per an April 1991 publishing contract. The 1991 Termination Agreement refers to all advances and royalties, up to and including publishing royalties. It is believed that Chaquico has not been receiving correct publishing royalties from Warner-Tamerlane as there are potential conflict of interests with Warner who also owns Rhino, and the negotiating parties, JSI and Afterthought as the entities have violated Chaquico's contractual rights to be involved in negotiations over the relicensing of master recordings of Jefferson Starship and Starship. Further, the entities involved have not disclosed their agreement to license songs on which Chaquico should receive publishing royalties, nor have they considered Chaquico's rights to reclaim his publishing rights. As the entities and individuals, Jampol, Rhino, Warner, and Warner-Tamerlane, have not been open and transparent with Chaquico per his March 21, 1985 contract, Chaquico is entitled the right to consultation and mutual agreement with respect to the administration of any Jefferson Starship master.

40. Between October 19, 2018 through the present, Rhino should be paying Chaquico his royalties including advances payable directly, without fees, commission, and other changes for any and all material or project in which Chaquico has participated in pursuant to the 1991 Termination Agreement. This has been documented specifically in the agreement on October 19, 2018 between JSI, Afterthought (as licensors) and Rhino, in which the licensors would desire to license Rhino the right to manufacture, promote, market, sell, distribute, and otherwise exploit recordings of the artists ("2018 Rhino Agreement"). As such, Rhino is informed and have knowledge of the accounting of the royalties, revenue, and income that is due and owing to Chaquico.

41. Pursuant to the 2018 Rhino Agreement, Chaquico is entitled to a semi-annual accounting statement as a third party royalty participant within 120 days after June 30 and December 31 of each year during which Masters are sold or otherwise exploited. As signatories to the Agreement, Grace Barnett Wing pka "Grace Slick," Jorma Ludwik Kaukonen, Jr p/k/a "Jorma Kaukonen," John William Casady p/k/a "Jack Casady," and Alexander Kantner ("Alex"), as sole heir and successor-in-interest to Paul Lorin Kantner (together as "Artists"), had warranted that all of the obligations, warranties, undertakings, covenants, and agreements on the part of Afterthought are true and correct. Further, the Artists are required to furnish Rhino with letters of directions directing Rhino to pay such third-party royalties in good faith. To this day, Chaquico has not received an accounting of any third-party royalties due and owing to him nor whether complete or incomplete letters of directions have been sent to Rhino or any applicable party.

42. Since Alex is a signatory to the 2018 Rhino Agreement and a successor-in-interest and heir to Kantner, he has received Chaquico's unpaid royalties without remittance. As such, Alex is informed and have knowledge of the accounting of the royalties, revenue, and income that is due and owing to Chaquico.

43. On or around September 2016, the court ordered the final distribution of the Estate of William Carl Thompson or otherwise known as Bill Thompson. As part of the final distribution, his heirs Stephani and Tyrone were distributed an interest in his estate

and are recipients of royalties for all related corporations such as JSI, Afterthought, JAI, Shiprats, and all active corporations under the same umbrella. As such, Stephani and Tyrone are informed and have knowledge of the accounting of the royalties, revenue, and income that is due and owing to Chaquico.

44. On or around May 7, 2020, Sony informed Chaquico that Chaquico was not accounted directly as Sony never received a completed letter of direction to split out his share and left off many key albums. Instead, the earnings were reported to Afterthought and thus Afterthought should be accounting to Chaquico for his share. Sony then began to list the albums for which Chaquico's share of missing royalties have been going through to Afterthought since, at least, 1991. Since the filing of this complaint, Chaquico has not received any accounting from Sony or any other entity with regards to royalties due to Chaquico per his 1991 Termination Agreement. As such, Sony has information and knowledge of the accounting of royalties in which Plaintiff is owed and is entitled to.

45. Plaintiff has attempted to make numerous requests for the Defendants to issue an accounting of revenue, income, or royalties of any kind, both foreign and domestic, to which Plaintiff is entitled to pursuant to his interest and rights to certain songs, albums, records, merchandise, projects, and revenue from any use of the name "Jefferson Starship" and "Starship." However, due to the failure to receive any accounting, information, or lack thereof, Plaintiff is forced to demand an accounting of all agreements, contracts, audits of revenue, income, and royalties.

## **FIRST CAUSE OF ACTION**

**(Accounting against all Defendants)**

46. Plaintiff incorporates by reference, as though fully stated here, the allegations in paragraphs 1 through 45, inclusive, of this Complaint.

47. At all relevant times herein mentioned, a relationship exists between the Plaintiff and each of the Defendants whereas Plaintiff and Defendants, either individually or as a successor-in-interest, agent, associate, director, employee, officer, member, manager, partner, subcontractor, advisor or related-representative of the associated

entity named in the Complaint executed an employment agreement, termination agreement, separation agreement or letter of direction concerning royalties, payments and interests due to the Plaintiff.

48. An issue exists to which a balance on royalties, payments, and interests are due to the Plaintiff that can only be ascertained by an accounting. By way of Accounting, the Defendant possesses information unknown to the Plaintiff that is relevant for the computation of money due to the Plaintiff.

49. Chaquico is entitled to documents, books, and/or records concerning Starship, Inc., Jefferson Starship, Inc., Shiprats, Inc., Bill Thompson Music and its affiliated entities, Afterthought Productions Corp., and any other entity concerning any royalties of any kind.

50. Specifically, Chaquico demands that each entity, as well as any other potentially related entities produce copies of each entity's balance sheet, profit & loss statement, details of expenses, cash disbursements & cash receipt journals, details of royalty income – including a song-by-song basis, if applicable, as well as royalty income from streaming services, calculations of royalty payments, any and all agreements between any mentioned, or potentially related entity concerning any master of any Starship albums, songs, merchandising, or other use of the Starship name, any licensing agreements or other agreements utilizing the "Jefferson Starship" or "Starship" intellectual property, any and all agreements concerning the use of Mr. Chaquico's likeliness and any other material or project in which he participated. Furthermore, Chaquico is also entitled to an accounting to any contracts between any of the above-mentioned entities, or related entities, concerning the payment of foreign revenue, including foreign royalties, streaming revenue, streaming royalties, and songwriting royalties.

51. Chaquico specifically demands an accounting above for the fiscal years 1996 through 2021.

///



52.     The amount of money due from the Defendants to Plaintiff is unknown to Plaintiff and cannot be ascertained without an accounting of the requested items. Plaintiff is informed and believes and thereon alleges that the amount owed, however, exceeds and will exceed the sum of $20,000,000.00.

## **PRAYER**

WHEREFORE, PLAINTIFF hereby prays for relief as follows:

  i. For an accounting between Plaintiff and Defendants;
  ii. For payment to Plaintiff of the amounts due from Defendants as a result of the account and interest from and after April 1996 through the present on an amount exceeding $20,000,000.00;
  iii. For reasonable attorney's fees as provided in agreements;
  iv. For costs of suit herein incurred; and
  v. For such other and further relief as the Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff demands a trial-by-jury of all issues so triable.

DATED: August 26, 2022                           **KROGH & DECKER, LLP**


By:   /s/ Crystal Huynh-Kim
       DEREK C. DECKER
       CRYSTAL HUYNH-KIM
       Attorneys for Plaintiff
       CRAIG CHAQUICO