UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

CRAIG CHAQUICO,

    Plaintiff,

    v.

JEFFERSON STARSHIP, INC., et al.,

    Defendants.

Case No. 22-cv-04907-RS

**ORDER GRANTING MOTION FOR SUMMARY JUDGMENT**

## I. INTRODUCTION

Plaintiff in this case is Craig Chaquico, a guitarist and songwriter who appeared on albums with some of the members of Jefferson Airplane in the early 1970s, during a time when that band was breaking into two factions. Chaquico ended up becoming a member of the faction that went forward under the name Jefferson Starship, and later, after more member changes, just "Starship." Chaquico was an important contributor to Jefferson Starship/Starship between 1976 and 1991, as the composer of several of their biggest hits, and as the only member performing on all of their albums and in all of their concerts.

By this action, Chaquico seeks to establish that royalty payments are due to him under a written termination agreement (the "1991 Termination Agreement") he executed in connection with leaving Starship. Although the complaint originally named a host of individuals and entities as defendants, Chaquico voluntarily dismissed all of them except Jefferson Starship, Inc. ("JSI")

and Shiprats, Inc., who are parties to the 1991 Termination Agreement.[1] The agreement was signed on behalf of JSI and Shiprats by Bill Thompson, the band's manager. In addition to signing for JSI and Shiprats, Thompson executed the agreement on his own behalf, as it also dissolved a separate contractual relationship between him and Chaquico related to services he provided Chaquico individually. Thompson, who died many years ago, is not a party to this action. Two individuals, alleged to have been the executor and representative of Thompson's estate, respectively, were among the defendants originally named herein but subsequently voluntarily dismissed.

Defendants now seek summary judgment both on their counterclaim that seeks declaratory relief regarding an issue of contractual interpretation of the 1991 Termination Agreement, and on the complaint. For the reasons explained below, the motion will be granted.

## II. LEGAL STANDARD

Summary judgment is proper "if the pleadings and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The purpose of summary judgment "is to isolate and dispose of factually unsupported claims or defenses." *Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986). The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings and admissions on file, together with the affidavits, if any, which it believes demonstrate

---

[1] The signature block on the agreement identifies JSI merely as "Starship, Inc." There is no dispute that JSI never completed the legal process to take "Jefferson" out of the corporate name. It instead sometimes used the truncated version as a dba. Chaquico does not contend the omission of "Jefferson" from the signature block and from references in the body of the agreement has any legal consequence. The distinction between the *band names* "Jefferson Starship" and "Starship," although relevant to certain historical disputes among the musicians, is not germane to the issues discussed in this order. The band (as opposed to the corporation) will hereinafter be referred to simply as "Starship," even though it was using the name "Jefferson Starship" during some of the relevant times.

CASE NO. 22-cv-04907-RS

2

the absence of a genuine issue of material fact." *Id*. at 323 (citations and internal quotation marks omitted). If it meets this burden, the moving party is then entitled to judgment as a matter of law when the non-moving party fails to make a sufficient showing on an essential element of the case with respect to which he bears the burden of proof at trial. *Id*. at 322-23.

The non-moving party "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The non-moving party cannot defeat the moving party's properly supported motion for summary judgment simply by alleging some factual dispute between the parties. To preclude the entry of summary judgment, the non-moving party must bring forth material facts, *i.e*., "facts that might affect the outcome of the suit under the governing law . . . . Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986). The opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574, 588 (1986).

## III. DISCUSSION

A. *The Counterclaim*

Defendants seek declaratory relief that, under the provisions of 1991 Termination Agreement, they are allowed to deduct "costs and expenses" when calculating Chaquico's share of any royalties they receive for recordings on which he played and/or sang. Indeed, Chaquico effectively agrees that this question of contract interpretation is the central point of dispute between the parties. Chaquico argues the plain language of the contract compels a result exactly opposite that advanced by defendants.

"A contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful." Cal. Civ. Code § 1636. A contract is ambiguous when "on its face it is capable of two different reasonable interpretations." *Republic Bank v. Marine Nat'l Bank*, 45 Cal. App. 4th 919, 924 (1996) (citation omitted). Extrinsic evidence is admissible to interpret an ambiguous contract when evidence is

proffered to "prove a meaning" to which the contract language is "reasonably susceptible." *See Pac. Gas & Elec. Co. v. G.W. Thomas Drayage & Rigging Co.*, 69 Cal. 2d 33, 37 (1968).

Here, Chaquico argues the 1991 Termination Agreement is not ambiguous, and he bases his reading of its meaning solely on the language of the document itself. Defendants similarly argue the contractual agreement is clear, and primarily base their proffered interpretation on its language and structure. To the extent the 1991 Agreement is ambiguous, however, and defendants' contentions depend on understanding the broader context of the transaction, the evidence they have introduced regarding such background is admissible as "evidence of the circumstances under which the agreement was made or to which it relates." Cal. Civ. Proc. Code § 1856(g). Furthermore, the background facts material to understanding the 1991 Termination Agreement are not in dispute.

Accordingly, the proper construction of the agreement may be decided on summary judgment, because it is "solely a judicial function to interpret a written instrument unless the interpretation turns upon the credibility of the extrinsic evidence." *Cachil Dehe Band of Wintun Indians of Colusa Indian Cmty. v. California*, 618 F.3d 1066, 1079 (9th Cir. 2010) (quoting *Parsons v. Bristol Dev. Co.*, 402 P.2d 839, 842 (1965)).

Chaquico both wrote songs for Starship and performed on the band's recordings of those songs and of songs written by other band members. Copyright law recognizes separate copyrights in musical compositions and in performances of musical compositions fixed in sound recordings. The former "protects the generic sound that would necessarily result from any performance of the piece." *Newton v. Diamond*, 204 F. Supp. 2d 1244, 1240 (C.D. Cal. 2002). The latter shields "the sound produced by the performer's rendition of the musical work." *Id*. at 1249–50. A distributing entity must obtain a license for each of these copyrights to distribute a sound recording lawfully.

As a composer, Chaquico was entitled to what are referred to as "publishing royalties" for the songs he wrote.[2] Chaquico and/or his own music publishing company, Lunatunes, held the

---

[2] Publishing royalties primarily take the form of "mechanical royalties," an amount set by statute due to songwriters for each record, cd, tape, of their compositions sold, or each digital copy

copyrights in those musical compositions. At all relevant times, Chaquico has received his publishing royalties separately—they were not simply shared among band members.[3] Following Chaquico's departure from the band, he entered into an agreement with Warner-Tamerlane Publishing Corp., which has paid him publishing royalties and accounted to him directly. Chaquico does not argue his publishing royalties are now in dispute in this action.[4]

As a performer on all the records the band recorded where he played guitar and/or sang Chaquico earned "artist royalties." Those records, however, were created as "works for hire." The copyrights in those recorded performances were originally held by Starship's record label, RCA, and have since reverted to JSI and/or Shiprats. Chaquico's right to artist royalties, therefore, do not arise directly from copyright law, as he has never been the copyright holder. Instead, Chaquico's right to share in the artist royalties generated from the recordings is a *contractual* right, established and circumscribed by his employment contracts with JSI and/or Shiprats, and by the 1991 Termination Agreement, to the extent it modified the employment agreements.

Although numerous agreements were executed over the decades, and some details varied, there is no dispute that from the inception of the band (and perhaps dating back to Jefferson Airplane), the basic arrangement was that all band members shared equally in the artist royalties paid by the record company on sales of the group's albums. One or more "employment"

---

streamed or downloaded.

[3] In some instances, Chaquico shared songwriting credit with one or more other bandmembers. Although the parties do not expressly discuss it, in such instances publishing royalties presumably were split among the composers. Also, under an employment agreement band members executed with JSI, one-half any mechanical royalties JSI received were shared with the band members for some period of time, with the balance going to the songwriters. The point remains, however, that publishing royalties were not simply shared equally among the band members, and were always treated differently from artist royalties.

[4] Chaquico's original complaint, in which Warner-Tamerlane was named as a defendant, raised issues with how his publishing royalties had been calculated, documented, and paid. He has not suggested, however, that any such claims remain following the voluntary dismissals of all defendants except JSI and Shiprats.

agreements to that effect were executed by band members and are not in controversy. Nor is there any dispute that under the arrangement (1) the group's manager, Bill Thompson, took an equal "band share," in lieu of a management commission, and (2) the band members and Thompson all shared equally in the costs and expenses associated with generating artist royalties.

Under the agreement between the band and RCA, ownership of the copyrights reverted to defendants in 2018. Defendants then negotiated a deal with Rhino Records to distribute material from the old albums on an ongoing basis. Rhino paid a large advance for artist royalties, which was distributed to all band members, including Chaquico. Defendants contend, and Chaquico does not dispute, that under the terms of the Rhino deal, no further artist royalties will be due until the revenues Rhino realizes from album sales and streaming services exceed the amount represented by the advance.

The heart of the fight is whether, under the terms of the 1991 Termination Agreement when Chaquico left the band, he remained liable for his pro rata share of any costs and expenses that might arise in connection with any ongoing and future artist royalties from the then-existing body of work in which he had participated. Chaquico's position is that the plain language of the agreement shows he negotiated an exit deal whereby he would continue to get his proportional share of artist royalties from sales and streaming of the prior material, but that he would no longer have to share in associated costs and expenses.

Under the 1991 Termination Agreement, however, Chaquico was to receive his share of artist royalties directly from RCA. Although Chaquico questions whether RCA properly calculated his share, that does not give rise to a claim against JSI or Shiprats.[5] The issue instead, is whether defendants were entitled to deduct from the Rhino advance the costs and expenses associated with negotiating and obtaining the Rhino deal, before distributing the balance to band

---

[5] JSI and Shiprats apparently are pursuing a challenge to RCA's overall royalty calculations for the relevant time period. They represent they will send Chaquico his share of any increased total royalty RCA may agree to pay, unless RCA pays Chaquico's share to him directly.

members, (including Chaquico) according to their proportionate shares.[6] Those deductions included an 18% commission charged by the management company that JSI and Shiprats had retained to obtain a new distribution agreement when the RCA contract was expiring, and legal and accounting fees incurred in sorting out the various agreements and royalty obligations, and in reaching the new deal with Rhino.

The 1991 Termination Agreement is in the form of a letter addressed to Chaquico, written by Bill Thompson, and signed by him "individually, and for Shiprats, Inc. and Starship, Inc." It begins "Dear Craig, This letter is intended to set forth our agreement regarding the terms of your termination with Starship." Throughout the letter, the term "you" is used to refer to Chaquico. The term "we," while never formally defined, appears to refer both to the Shiprats and Starship entities and to Bill Thompson, individually. In contrast, the letter typically uses the term "me" when referring specifically to Thompson (the letter's author), although in at least one instance the letter refers to obligations of "Bill Thompson," using the third person.

The critical provision is paragraph 4. It states:

> You will be entitled to direct payment of your continuing equal pro-rata share of artist royalties and merchandising royalties, and any other income, royalties, or advances payable with respect to any recording project, album, single or any other material or project in which you participated. You will also be entitled to direct payment of all publishing royalties, domestic, foreign, or any other income, royalties or advances due you or Lunatunes Music with respect to each and all musical compositions written or co-written by you. <u>You will no longer be charged a ten percent (10%) administration fee, nor will any of your royalties, advances, or other earnings be subject to any fees, commissions, or other charges by me.</u>

(Emphasis added.)

Chaquico's position is simple: the plain language of the highlighted portion of the

---

[6] Although band members shared artist royalties equally, dividing up the Rhino advance was more complicated, because it represented royalties for numerous albums and individual songs recorded over many years, and the band included different members at different times. Chaquico received the largest share of the advance, because he played on more of the recordings than any of the other members, including the albums and songs that generated the most royalties.

provision means defendants cannot deduct "fees, commissions, or other charges" from his share of *any* form of royalties—including the artist royalties in dispute. Defendants, in turn, argue that the context and wording of the provision clearly demonstrate that it relates only to Chaquico's publishing royalties, and to "fees, commissions, or other charges" imposed *by Thompson.*

      Defendants have the better of the argument. First, the structure of the paragraph plainly supports the interpretation that the prohibition against imposing "fees, commissions, or other charges" relates only to publishing royalties, not artist royalties. The first sentence of the paragraph expressly addresses artist royalties—"You will be entitled to . . . ." The second sentence turns to publishing royalties— "You will also be entitled to . . . ." The critical third sentence elaborates on the second sentence. Its first clause undeniably relates solely to publishing royalties, because it expressly refers to the ten percent (10%) administration fee rate Thompson had been charging on publishing royalties. While the second clause—on which Chaquico's entire interpretation argument rests—uses the word "royalties" without expressly specifying "publishing," it would be an unnatural and strained reading to conclude the sentence has pivoted again to encompass the topic of artist royalties discussed separately in the first sentence.

      Chaquico's strongest argument is that the clause does use the phrase "*any* of your royalties," which, in some situations could reasonably be seen an attempt to include both artist royalties and publishing royalties. In this context, however, "any" modifies royalties, advances, and other earnings, and must be understood as wording intended to avoid any presumption that there necessarily would be income in all three of those categories—i.e., the phrase "any of . . ." is effectively equivalent to adding " . . . if any" at the end of the list. Admittedly the wording is inelegant, but to the extent the omission of the word "publishing" from the clause creates ambiguity, the overall context and structure of paragraph 4, including undisputed background evidence that Thomas had been charging a ten percent (10%) administration fee only on publishing royalties, leads to the inescapable conclusion that there is no limitation on deducting

fees and expenses from artist royalties.[7]

Moreover, even if the clause could reasonably be construed as applying to artist royalties, it quite expressly only prohibits deductions "by me"—*i.e.*, by Thompson. The deductions about which Chaquico is complaining were made by JSI and/or Shiprats, both of whom were parties to the 1991 Termination Agreement, but neither of whom agreed to refrain from charging expenses to Chaquico.[8]

Indeed, this only further shows the clause applies simply to publishing royalties. Chaquico has never suggested that the 1991 Termination Agreement meant that Thompson's "band share" portion of the artist royalties should not be deducted from the total artist royalties when RCA was calculating the artist royalty amount it was to send directly to Chaquico. There is no dispute that Thompson's "band share" represented his commission/fee for managing the band—he did not participate as an artist on any of the recordings. If the 1991 Termination Agreement truly prohibited Chaquico from being charged with any management fees or commissions against his artist royalties, his royalties would have to be calculated from a total that excluded Thompson's share. There is no indication that ever happened or that Chaquico ever contended it should.

Conversely, because the parties plainly understood Thompson's band share would continue to be assessed against the total artist royalties when calculating Chaquico's share of those royalties, there is no basis to conclude that JSI and/or Shiprats cannot now charge management

---

[7] Chaquico characterizes this reading as one that impermissibly "adds words" to the agreement. Not so, it merely applies standard principles of construction to apply the limitation on deducting costs and expenses in the correct context.

[8] Chaquico argues the singular "me" in contracts can be construed as referring to multiple parties, including entities. While that may be true where the context of language supports it, nothing in the 1991 Termination Agreement suggests "me" was intended to encompass JSI and/or Shiprats. Chaquico also contends a provision of the agreement binding the parties' successors warrants treating JSI and Shiprats as the "me" in the third sentence of the paragraph. There is nothing from which to conclude JSI and/or Shiprats are legal successors in interest to Thompson under the 1991 Agreement, or for any other purposes. As noted, Chaquico originally sued representatives of Thompson's estate, but has voluntarily dismissed them.

fees and similar expenses against the total artist royalties when calculating Chaquico's share.

Finally, it is apparent this issue arose at least in part because at the time the 1991 Termination Agreement was negotiated and executed, JSI and Shiprats simply were not incurring any significant expenses in connection with generating artist royalties from the existing catalogue of Starship recordings. Given that the parties knew the RCA deal would eventually expire, it is unfortunate that they did not include more explicit provisions regarding how any new expenses necessary to exploit the value of the existing catalogue would be shared. In the absence of any express provisions to the contrary, however, there is no basis to preclude JSI and Shiprats from spreading those expenses among the persons who benefit from the resulting royalty income stream. Defendants' motion for summary judgment on their counterclaim must be granted.

B. The complaint

Defendants also contend they are entitled to summary judgment on Chaquico's complaint, which asserts only one claim for relief, entitled "Accounting." Defendants insist Chaquico has already received all the documents and information he would possibly be entitled to as an "accounting."[9]

As an initial matter, Chaquico was permitted to proceed with this action largely because his complaint, while labeled as seeking an "accounting," was adequate to state a claim for breach of contract. The prior order observed that an accounting is best thought of as merely a potential remedy for, and/or derivative of, some other valid claim for relief. *See, e.g., Paparella v. Plume*

---

[9] Defendants contend "in the alternative," that any *monetary* claims Chaquico might wish to pursue other than those that turn on his interpretation of paragraph 4 of the 1991 Termination Agreement, are either (1) not ripe, to the extent they arise from the current Rhino deal, because it will pay no royalties until the advance is recouped, (2) not ripe to the extent they arise from the ongoing royalty dispute between defendants and RCA noted above, or, (3) barred by the statute of limitations and/or laches. Defendants' ripeness arguments have merit, and serve as an additional basis for dismissal to the extent Chaquico's is advancing such claims at this juncture. The laches and statute of limitations arguments need not be decided in light of the outcome of this order.

*Design, Inc.*, No. 22-CV-01295-WHO, 2022 WL 2915706, at *8 (N.D. Cal. July 25, 2022) (finding "request for an accounting is more accurately understood as a remedy, not an independent cause of action."). Chaquico appears to believe that if an accounting is granted, the court will somehow carry out the examination of the relevant books and documents (perhaps through appointment of a special master) and then ultimately decide how much each party owes or is owed, and then enter orders to that effect. In other words, Chaquico is arguing the court can and should order an accounting under its equitable jurisdiction simply because the records and facts are complicated, so that he can learn in the first instance whether he is actually owed money or not.

Even assuming such a procedure may be appropriate in some equitable circumstances, this is an ordinary contract dispute, involving the parties' respective rights and obligations under the various written agreements they made, and indirectly, under copyright law. It is incumbent on Chaquico to determine though the discovery process whether and how he believes defendants have breached their contracts with him, and what his resulting damages are, if any.

Chaquico's complaint alleged a host of allegations that various original parties perhaps had breached numerous provisions of assorted contracts. At summary judgment, however, the only alleged breach of contract Chaquico has argued defendants committed is deducting expenses from the total artists royalties they received through the Rhino advance, before calculating his share.[10] Because that was permissible under the 1991 Termination Agreement, and because Chaquico has identified no other contractual breaches, summary judgment against him on his contract claim is warranted.

To the extent his complaint could be construed as stating some other independent claim for "an accounting," he has not shown he is entitled to more than he has already received, because it is his obligation to analyze the records provided to him and then articulate any claims he may have.

---

[10] It is possible Chaquico believes defendants similarly deducted expenses from other artist royalty payments they received after RCA stopped paying him directly and before the Rhino advance. If so, the same analysis applies, and it was not a breach of the 1991 Termination Agreement.

Any dissatisfaction he has with the completeness of the documentation provided was grounds for a motion to compel further discovery, not a basis to require the court to conduct some kind of accounting procedure. Accordingly, the motion for summary judgment in defendants' favor on the complaint must be granted.

## IV. CONCLUSION

Defendants' motion for summary judgment is granted, both on the claim and the counterclaim. A separate judgment will issue.[11]

**IT IS SO ORDERED**.

Dated: March 25, 2024

_____
RICHARD SEEBORG
Chief United States District Judge

---

[11] With his opposition, Chaquico filed a motion to seal certain exhibits that defendants had designated as "confidential" and to redact minimal portions of his brief that quoted from those documents. Defendants failed to file the response required by Civil Local Rule 79-5(f)(3). Cursory review of the material suggests that while much of it involves financial information that defendants might prefer to remain confidential, the data does not self-evidently represent information that could be used to the competitive disadvantage of defendants or the involved third-parties, or otherwise plainly qualify for sealing. Accordingly, the sealing motion will be deemed denied 5 days from the date of this order, unless defendants submit a response adequately demonstrating that at least some portion of the material warrants sealing.